The third case on our docket this morning is IAS Services Group, LLC, versus Jim Buckley and Associates, Inc. Mr. Davis. May it please the court, counsel. Almost three years ago, this court issued an opinion that provided thoughtful guidance both to the parties and to the district court about what facts, if proven, could constitute fraud. IAS followed that guidance carefully at the trial after remand and proved those facts. By contrast, the district court candidly admitted that the court had skin in the game and proceeded to turn this court's opinion on its head. For the second time, IAS is before this court asking this court to reverse the district court. My name is Jason Davis. I'm here with my law partner, Jay Hulings, and we represent IAS in this appeal, and we represented IAS at the trial after remand. This case really involves two issues. One is the liability for fraud, and the second is attorney's fees. On both of those issues, the district court disregarded the controlling law and committed error, and we're here asking for a reversal. So, the standard of review, as in all cases, is critical in this case. The standard of review, certainly after a bench trial, is clear error for findings of fact, but de novo, not only for questions of law, but for mixed questions of law and fact. And in this case, one of those critical mixed questions of law and fact is materiality. Materiality. Now, in this case, JBA, in its briefing, refers to the hotly contested facts. JBA, in its briefing, says for this court to give deference to the district court's 48-page findings of fact and conclusions of law, described as thoughtful. JBA wrote those findings of fact, and certainly that's a common practice, but this court has repeatedly cautioned, and in fact sometimes discouraged, a district court from taking verbatim the findings of fact and incorporating them. In the Amstar v. Domino's case cited in our brief, this court said, there's a reason why you shouldn't do that, because taking a piece that's an advocacy piece gives the appellate court some reason to doubt the findings of fact. And in this case, the findings of fact were an advocacy piece. Certainly the district court included an introduction that was colorful. The district court cited to a pornography case from the Supreme Court, made some comments about this court's prior reversal. In fact, this district court tallied the votes, and he said, well, the magistrate that originally recommended dismissal and the dissenting vote in this court, combined with him, outvoted the two that voted. So it was certainly a colorful introduction. The rest of the facts were written by JBA and adopted verbatim. This court has cautioned. Why is that important in this case? For example, and this is one, and the rest are cited in our brief. The findings of fact make a statement that Mr. Buckley did not intend that IAS rely upon certain representations. Mr. Buckley testified to the opposite. Mr. Buckley testified, and I have a few demonstratives because this was so key, Mr. Buckley testified during a critical meeting in July of 2011, and it's contained in the demonstrative, that he intended, he hoped, he expected for Larry Cochran and IAS to rely upon his representations. That is an example of why the findings of fact in this case should be looked at with some suspect. That being said, materiality is not subject to clear error. Materiality, which is the central issue in this case, is subject to a de novo review. So, I want to mention briefly, the district court said that perhaps that we've waived our argument, that we've raised, that we've waived the claim of fraud by nondisclosure. I don't think JBA is putting a lot of weight into that. They talk about it only in a footnote in their brief, which is footnote number nine on page 30 of their brief. But certainly that argument in this case is nonsensical. The Fifth Circuit, this court, has already addressed the issue of nondisclosure in its first opinion. As Chief Judge Owen on a panel with Judge Clement and in the Cordero case, also with Judge King, nondisclosure is but a theory of misrepresentation that goes to the misrepresentation of fraud. It's not a different species. So there has been no waiver, and for that reason I don't think JBA spends a lot of time on the brief. So we really get to the two substantive areas of fraud. The two substantive areas, and in this case the first are the statements made concerning the scorecards or the rankings. The second is the representations made in the contract in section 2.3, both of which this court provided very specific guidance that said if these facts, as alleged then in the complaint, are true, yes, this would be fraud. So what was shown during trial? The first demonstrative shows what was said about these key facts. And by the way, JBA talks about the facts being hotly contested. The facts that are relevant to this court's review of that first basis of fraud are not contested. This is the context. A letter of intent had been signed for a $3.6 million acquisition of Mr. Buckley's company. It had been signed. There was a key meeting after that letter of intent was signed in July, almost 10 years ago, July of 2011. Why was that meeting key? The Fifth Circuit remarked in its first opinion that the timing was critical. The timing was critical because the deal hadn't closed yet. So IAS, through Mr. Cochran, meets with Mr. Buckley, and these facts are undisputed. The most important asset and most important customer of JBA was its relationship with QBE, also Balboa. It's referred to as QBE in the brief. Everyone agrees that's the most important asset. The QBE contract did not guarantee future income. Everyone agrees to that. That's why this court affirmed the breach of contract in favor of Mr. Buckley in round one. So without a guarantee of future income, what was the most important thing? The strength of the relationship between JBA and QBE. Because Mr. Buckley told Mr. Cochran, I'm not going to let you speak to our customer, and there's no guarantee of revenue, therefore the strength that we have, our relationship, is key. Everyone agrees to that. Everyone agrees that during this critical meeting in July, Mr. Cochran says, tell me about your relationship with QBE. Everyone agrees that Mr. Buckley then, critically, volunteers a ranking. Mr. Buckley says, we're QBE's number one vendor. There's a dispute about whether that statement included the number one vendor in California or the number one vendor in general, but it doesn't matter for this review. Because just as the gentleman said in the previous argument when he talked about reckless fraud, when someone decides to volunteer and give partial information but doesn't provide  That is fraud. This court said in its first opinion, if you don't talk, by concealing these scorecards and the actual rankings, and then volunteering a ranking of number one, you have created a false impression. The Anderson case, cited by both parties, is dispositive. The Anderson case involved a manufacturer of valves. That was Anderson. It had a contract with a company named Nabisco. And so Anderson goes to Nabisco trying to induce Nabisco into a contract and says, hey, we're going to be partners forever. We're going to be, we're in this forever, we'll never try to get you out. What Anderson didn't tell Nabisco is that there was an internal memo with Anderson that said the opposite. That said the goal was really to force Nabisco out and not do business with it. Very similar to here. When Mr. Buckley made the representation that they were the number one vendor for QBE, he knew about a memo that was there the month before that said, we're not number one. Mr. Davis, you're a little bit over halfway through. You remember at the beginning when you said the court had skin in the game? Yes. Yes, Your Honor. Which court were you talking about and what skin are you talking about? That's a great question because when this court reversed the district court and said, you got to go try this case, the original posture of this case was a fraudulent inducement claim was brought. It was dismissed on a Rule 12 motion, a recommendation of the magistrate that was adopted by the district court. That was appealed for the first time here. In August of 2018, this court issued its first opinion and said, no, these allegations, if proven, would support a claim of fraudulent inducement. When it was reversed, the district court in this case, it was a bench trial, took it and immediately took umbrage with it. In fact, I think the page of the record which talks about it, it was very, very candid and frankly audacious about that. It was 78-46 and 47, the record on appeal. The district court said, now, maybe we should get some fresh eyes on this. I have, quote, skin in the game. I'm not starting on a clean slate. Not a basis for recusal because JBA commented, well, we've waived our right to recusal. This is not an extrajudicial source which would be a basis for recusal. This is a district court admitting after being reversed by this court, I've got some skin in the game. Why was this a strange procedural posture? Because it's a bench trial. If this were a jury trial and it's sent back, they don't get to go call in the same jurors and say, hey, we're going to try it again in front of people that heard the evidence the first time. But because it was a bench trial, because there was a waiver of jury trial, IAS found itself in front of the same fact finder. And the fact finder himself was very candid in saying, I'm emotional about this. I know I shouldn't be, but I'm not starting on a clean slate. And Judge Graves, because of that, we filed a Rule 39C motion for advisory jury. When the district court decided not to bring in a visiting judge, not to assign it to the magistrate, but to keep it, after admitting on the record that he was not starting on a clean slate, we said, there's no basis for recusal because it's not extrajudicial. So judge, please bring in a Rule 39C advisory jury. That will be the fresh eyes on these facts to decide if we can prove the facts that the statute tells us would constitute fraud. It was denied. You considered but determined not to file a motion for recusal? Yes, your honor. I don't think that under the statute, under either statute for recusal, there was an extrajudicial source of bias. But so what we did is we gave the court the option under the rules of 39C, bringing in independent fresh eyes. He said no. So he tried it again, but for all those reasons, Judge Graves, the result was already determined. And so the record, which is cited in our brief, which is 7846-247, talked about his own candid admissions of being emotional with skin in the game. So it was kind of, it was a, we were going in that direction regardless. But what happened at trial was we proved the facts that this court said would constitute fraud. And so I, the Anderson case is briefed in length in our brief. It is the nondisclosure of a memorandum that would have actually provided the full truth. It is very analogous to this case. There's really no attempt to distinguish it by the other side. This court has also recognized in the Shaver case that we've cited, in fact, also in the footnote in the Cordero case, Chief Judge Owen, there was an excellent acknowledgment that the courts of appeals have acknowledged a duty to disclose when someone makes a partial disclosure, when failure to give all the information would be misleading. Now the Shaver case is not precedential, and so the Fifth Circuit hasn't come out and talked about this, it's not foreclosed certainly, hasn't come out and talked about this duty to disclose outside of a fiduciary confidential relationship based on the partial disclosure. But this, the Bombardier case, the Texas Supreme Court in 2019 recognized that duty, and it's recognized in the state court. So that is, that's critical. The materiality review, are reports, rankings, material, are they important? This court already commented in opinion number one that they were, and certainly they were critical. They went directly to the risk that IAS had to consider. What's the risk of JBA losing QBE? It's the strength of the relationship. They go straight to it. All of the findings of fact that try to make those findings a fact, no, that's a mixed question and it's subject to de novo review by this court. So the other section, which I think is in the brief, is section 2.3. Section 2.3 is another demonstrative, and this is straightforward, this is a question of law. There was a clause in the contract that JBA made a written representation to IAS that said, by entering into this contract, by assigning you, IAS, the contract we have with QBE, we're not going to be breaching any contract. The Fifth Circuit says, yes, that's a representation that someone would reasonably rely upon. Before this transaction, you're going to not breach any deals with your clients. When JBA assigned the QBE contract to IAS, JBA breached its contract with QBE because they did not obtain consent. It is material, it was central to the deal, it was justifiably relied upon, and it caused damage. So the section 2.3 is an independent basis for fraud that is clear just from the language of the agreement itself. We get to damages. You know, Formosa talks about the damages, I don't have to remind this Court, the Texas Supreme Court talked about the damages for a fraud case. You can elect damages between rescission or actual damages. We made, even though there's some loose language, certainly on both sides, at the time of trial we made the election of actual damages. Formosa says there's two measures of damage for fraud, out of pocket or benefit of the bargain. This was out of pocket. This was IAS was damaged in the difference of the value that it paid and the value that it received, measured on the day of the transaction. And so I want to spend just a second talking about attorney's fees, and then I can raise it again. The attorney's fees issue, it gets confusing in the briefs, and that's why we made this demonstrative. There's really three buckets of attorney's fees at issue. One was the judge recognized, at least after this Court reversed him on the severance issue, that IAS was entitled to its fees on the severance issue, and he awarded those to us. I see my time, may I use some of my rebuttal time? Yes. And so I, so the judge looked at the attorney's fees issue and said, okay, we're going to award IAS some of its fees because it prevailed in the Fifth Circuit on severance. That was proper. And then we said, well, Judge, what you have to do, then, you have to sever, segregate the fees that JBA spent on that same issue because it can be segregated. He refused to do so. And that's the first bucket of fees. For that same reason, we said, Judge, because you have awarded us, IAS now, fees for appealing the severance issue, you must also segregate and reduce JBA's award for that same issue from its appellate fees. He refused to do so. So those are the two buckets of fees, clear error, that should be reversed on attorney's fees regardless of what happens on liability. The third bucket of attorney's fees is this. The judge awarded JBA all of its fees for defending the trial after remand. That trial was a single claim of fraudulent inducement. That's it. The judge's order said, I'm going to award those because under the seller's note there was a contractual provision that said that the prevailing party in actions to enforce or collect can get their fees. That is against controlling law. Texas doesn't allow recovery of fees for just defense of fraudulent inducement claims. Now there's Varner v. Cardenas that says if it's in the same trial and it's necessary, then yes, you can look at that. This was not that. This is not Varner v. Cardenas. But regardless, the district court hens the entire ruling on the seller's note. Fazio, the case cited in our brief, destroys that argument. Fazio says you look at the contractual clause and it says, does it allow for recovery of fees? If the contractual clause says something like this, you may recover fees from any transaction related to this, then you can recover fees. That's not what Fazio's clause says and it's not what this clause said. This clause says enforcement or collection of the note. Fraudulent inducement, as the court said in Fazio, is a pre-contract tort. There was no basis to award them their fees. We're asking that the award of fees from that be reversed and rendered. Otherwise, it would be an extension of Texas law, that the Texas Supreme Court hasn't gone. I'll reserve respectfully the rest of my time for rebuttal. Judge Keltner? Your Honor, if it pleases the court, I'm David Keltner and with Leslie Rotman, I'm proud to represent Jim Buckley and Jim Buckley Associates. Let me say two things up front and Judge Graves, answer your question about skin in the game. The judge pointed out that the parties' contract required the case to be tried to a court, no jury. And he said, you know, I've tried this before, I avoid credibility of the witnesses. And that was what he was doing. Let me put that in context. He was not saying, I'm going to decide for you no matter what. He had just resolved credibility issues and there were a number and I'm going to talk about those in some detail. The second thing I said up front was something that's bothersome to me and that is that this, the previous panel, provided a road map. Now, dismissal on the pleadings, which is the only thing that was reversed and returned, is a far different standard than judging the credibility and the differences in testimony between the witnesses. Just because you put on testimony doesn't mean it is believable and that's what happened here. Let me give you an example with the very first thing, the issue of we were told we were number one. Let's be important, let's be real careful about that because they keep on saying vendor panel said number one vendor. Jim Buckley did not say that. What he said, and he was very clear, that somebody at QBE had told them they were the number one vendor. Not related to a panel and didn't even use the term vendor. Just said, you're our number one in California and Jim said, I knew that was true. How did he know it was true? Was it based on rankings? No. What he knew was there were only three adjusting farms in all of California. Those are the only ones that did the California work for QBE. Jim Buckley Associates had 50% of that business. They were doing more business than anybody else in California. He tied it to volume. By the way, Judge Berry did the same thing and resolved that conflict in the evidence, which was crucial. And in fact, there was other evidence that supported that. The two investment advisors for IAS, the ones who put this deal together, testified they saw no evidence that Jim Buckley and Associates was not the number one based on volume. And claims and revenue, which was the representation. So the other thing is, well, did the alleged so-called scorecards have any impact? And the answer to that is no. You can tell that exactly from objective evidence. Defendants Exhibit 28 was a listing of claims and Jim Buckley's rating was increasing during the time all the way up to the sale. Findings of fact 32, 33, 47, 34, all say the claims were increasing. There was no correlation between the scorecards and the amount of business Jim Buckley was given. And their witness, John Gomez, says exactly the same thing. And he said there wasn't any correlation at all and the business was increasing. He said JBA was killing it up to the time of the sale. Mr. Buckley didn't think the sale cards were relevant because there wasn't any correlation and that was a plausible explanation. Let me draw the court's attention to Judge King's previous opinion on a very related case. In fact, it's almost the spotted dog case. United Teachers decided in 2005. Also the sale, not of an insurance adjusting company, but of an insurance company. And the plan was for the buyer to buy the insurance company, increase the premiums and make a lot of money. And the one thing that they didn't, that wasn't produced because it wasn't asked for were consent decrees entered into by the seller in which limited in some states the rights to increased premium. Was that fraudulent intent? The judge said no. Here's why. One, you didn't ask for them and you could very well see why they then weren't producible. Second, the person didn't think they might apply to the new buyer, affirming a decision against fraudulent inducement for nondisclosure in 2005. By the way, just as an aside, we do not have disagreement with the idea that Bombardier opinion from Paul Green in 2019 says that you can have fraudulent inducement by nondisclosure. And we don't take that on in the brief. I think you probably recognized. The other thing is, what the judge concentrated on was, well, was there an intent here? After all, Mr. Buckley had offered to sell the company to them with a buyback agreement in which would have protected against the loss of the client. But in hindsight, law is clear. I mean, the facts are clear here. We know that nothing to do with performance had anything to do with termination of this business. How do we know it? We know it from QBE. Mr. Anderson, their vice president in charge of all this, testified. And he said there were no performance issues with JBA. Everything was fine. Now, strange, he wasn't asked any questions by the other side about what scorecard effects had. That was left unasked and unanswered. But went ahead and said the only reason we changed was we had a change in business models. And so you'll understand what happened is, this got to be a conglomerate of three separate companies. All had been operated as one. To save costs, they put them together. It was nationwide. They had to have nationwide providers. Neither JBA or IAS could provide that. That's it. Bottom line is, the statement was truthful, too. Certainly, in hindsight, we know it wasn't material. No fraudulent intent. How do we know that? United Teachers says if a judge makes a decision based on that and tried to a court and there's a plausible explanation, that does it. Let's look at 2.3. The 2.3, they say, is a representation that we were required to get consent. It's not what 2.3 says. And, in fact, if you look even at their handout on 2.3, what it says is there's a representation that the sale and assignment of the contract will not breach or require consent and create the right to terminate. There was no right to terminate under the QBE contract. The assignment might very well be void, which was the case, but so we have that. Arguably material? Don't really think so, but let's assume it is. Was it fraudulent intent? Did they rely on it? Here are the facts, and these were disputed, and let's talk about them because the court resolved them. First, IAS knew that the QBE contract required prior consent. They knew that going in. Initially, Mr. Cochran, on behalf of IAS, said, no, we never got that contract. He was proven that that was not true, had to retreat from that position, and he had the contract, knew it required prior consent, but they also told him that he was not going to consent or not going to talk to any of his customers about the sale of the business for fear of running those customers off. In the first trial, by the way, Mr. Cochran said, that's a pretty wise idea. That's something that you do. That's what I'd do under those circumstances. Also, Mr. Cochran said he doesn't recall Buckley saying that. The court resolved that issue clearly, and that is finding of fact 58. Then, also, there was a nondisclosure agreement that was done just a month or so before that that prevented Buckley from talking to any of his customers about the sale. Cochran admitted that was true, admitted that it prevented that, and then in the first trial he said, yeah, he couldn't have talked to them. In the second trial, here's his story, he said, well, I expected him to breach that NDA agreement. The judge found that not to be credible, and I would think that is a good finding. He expected who to breach the NDA? He expected Jim Buckley to breach the nondisclosure agreement and go to QBE and try to get the consent judge, and that's what Buckley had already told him he wasn't going to do. All those were resolved in our favor, and actually in both trials. Now, the other thing is, and we argued this before with a prior panel, the APA agreement, which was the sale agreement between IAS and JBA, also had another provision that dealt with unassigned contracts. It was 4.2. Now, the court held there that that was not, the prior panel held, of course, that wasn't the kind of red flag that would put you on alert that something was wrong, but the real truth of the matter is 4.2 provided this, that if there are unassigned contracts, was that mean? Parties anticipated there would be. How do you deal with it? Then the seller, Jim Buckley, would use his best efforts to try to get that contract assigned. What's the evidence? It's undisputed that that's precisely what he did. So the bottom line is, there can be no justifiable reliance on that at all. The NDA prevents it, the conversations before present it, 4.2 does as well, and it caused no injury. Let's talk about injury for a minute. I like to break this down into two factors. First off, there's the fact of injury or damage, whether it occurred or not, whether there was anything. Court found there wasn't. Why? That is because the QBE contract guaranteed no business, and also they could counsel for any reason at any time on 45 days' notice is exactly what they did. And the question was, was it performance-based? For them to win, it has to be on a performance base. It wasn't. And in fact, at page 652 of the prior panel's decision, the court takes on that and says this, the district court's conclusion that IAS did not suffer any damage is plausible  Same thing, I think, on fraud damages. What were the findings? 65. No injury. The business model, the changed business model of QBE was the sole reason for the loss. Finding of fact 51, same thing on the number one comment. So that does it. Also if we get rid, we get past the fact of damages, we deal with what, an injury. We deal with another issue, and that is, okay, did they prove it? They put all their damage stuff on and all injury matters on through one expert witness, Mr. McKee. He testified that actually there would have been lower EBITDA multiple applied if they knew QBE wasn't going to give them any more business. Well, first off, up front, you do that before the sale when no one knows? And by the way, testimony on that is clear. Anderson from QBE said no one knew. We didn't let anybody know outside the company that we were considering a consolidation and canceling some of these contracts. Jim Buckley couldn't have known, and IAS didn't either. So do you change the EBITDA? Well, actually, that's against GAAP principles. But nonetheless, let's get aside that. Next issue is, well, so you're going to change the multiple on what basis? Here's what he used, and this is how bad his opinion is. He used the investment advisor's publication that had a list of sales and multiples. Didn't verify any of that, and in fact, he tried to say that Mr. Pormann, who was one of the investment advisors, again, of our IAS, he talked to him about that. When Pormann was asked about it, he said, no, 15 to 30-minute conversation, we never discussed that. There is no basis for that. It's pure speculation, which the judge found in finding 53. It wasn't vetted, no peer reviewed, and in findings 54 and 56, he found it unreliable. Let me talk briefly about attorney's fees, and then I'm going to turn to equitable defenses. They make a couple of arguments on attorney's fees that I think are important for the court to review. The first one, they said, you can't give attorney's fees for fraud. That's right. Generally, you cannot. No doubt about that. But in Tony Gello Motors, Judge Brister, on the Texas Supreme Court in 2006 held, if to recover on a contract, which does allow fees, you have to disprove a counterclaim or a defense for something that otherwise would not be recoverable, you're entitled to recover your attorney's fees for that. In 2007, although he mentioned the case, he didn't go into detail about it, the Supreme Court, one year later, in a per curiam opinion, revisits that, and that is Varner v. Cardenas. In that case, the court's very clear, and there was a counterclaim there for which no fees would normally be allowed, but it was a defense to recovery on the contract. And the Supreme Court said, recovery's the right word. And it's the definitive word. And if you have to prove something to recover on a contract, you've got to overcome a defense, then those attorney's fees are recoverable. And by the way, let's talk about that, what they did. First off, after this case was reversed and sent back, Sidney Powell, who had been the attorney in charge of the case, she went back to the Supreme Court and said, I'm going to quote her. She said, at the status conference, the reinstatement of the fraudulent inducement claims vitiates, would vitiate all contract claims. It would completely wipe them out. Immediately after that, when she did a mandamus to this court, trying to get rid of the supersedious bond, here's what she said. To succeed on its breach of contract claim, JBA had to defeat the fraudulent inducement claim. Exactly what Varner v. Cardenas says is recoverable. If you have to defeat it, even though they're not otherwise fees void, you get to recover them for that reason. You know, we have sort of an issue. They keep saying, well, we chose to benefit from bargain damages. We're not saying the fraud vitiates. We're not going for rescission. Look at their briefs. The brief, appellant's brief, page 54, I'm going to quote again. The second trial exclusively concerned a pre-contractual fraud claim that sought to render the contracts unenforceable. Under Varner, we get fees in that situation. Their reply brief, the last brief filed, IAS would owe the defendants the amount on the fraudulent inducement claim. We get attorney's fees under Varner for that. The closer call, I have to admit to you, is the issue on the severance pay. Let me explain how that came up because the context is lost in the other side's briefing and in their presentation. Here's what happened. There was an employment agreement, and they basically said the employment agreement didn't apply under the provisions of it, that Jim Buckley had been terminated for cause. We fought that. We won that at the trial court. This circuit affirmed that, by the way. The one thing is there were two elements of damage, some vacation pay and then also a severance pay. Jim Buckley did not sign the release required to get severance, and the court pointed that out and I think correctly said, if you look back to our previous oral argument, we said this, that he didn't, and that might cause a problem. Is that going to make a difference on the severance of that? No. And look at Roremost Ventures versus University of Texas Southwestern Medical School. It was decided by Justice Greene in 2019. It addressed a very similar issue, and here's what he said. The whole idea of who is the prevailing party deals with this. Actual and meaningful relief materially altering the party's legal relationship. We won that. We found it wasn't for cause. Now we lost part. What does Justice Greene say about that? Even if the final judgment rejects the claim for non-merit reasons, still you're the prevailing party. That's exactly what happened here. I have just a few moments I can talk about the equitable relief, and I'll do it briefly. And tell you, we primarily rely, although it's not necessary for this, on our ratification and waiver. Justice Owen, this deals with your opinion in Fortune versus Conoco. In that case, the court held that you could have a fraudulent inducement claim, and it could be, and that contract could be ratified. There were two groups of plaintiffs in that, and my time's about to expire, so I'll do quick. If it is an executory contract or the contract was not fulfilled, you were foreclosed from recovering damages. On the other side, if it's fully performed, you're not. What happened here? Two years and four months, they know, they say they know about the fraud six days after the closing. That's what Mr. Cochran told his board. Nonetheless, they keep Jim Buckley on for two years, four months. Then, after he gets the two major clients that has made that company profitable today, they fired him. That contract was violated. It wasn't, and all of those agreements were breached, every one of them. So, they remain executory under the Conoco case. In Fortune v. Conoco, we are entitled to those equitable relief as well. My time's expired. Thank you, Counselor. Thank you. Mr. Davis? I'd like to address those quickly, kind of starting with the last. We cite extensively Fortune v. Conoco. That precludes a rescission argument, which isn't being made. The record was clear when we went into this trial, even if it wasn't before. We aren't seeking rescission. It's actual damages and out-of-pocket award, not precluded by Fortune v. Conoco, which takes us to damages. I just heard Counsel in a brief saying that the only witness was our expert. Incorrect. Their expert actually admitted that you would adjust the multiple based on the risk of the transaction of the strength of the relationship. Their expert, in direct response to questioning from Judge Beery during trial, you can find that, the record on appeal, 8582 to 83. In addition, the owner of the company obviously talked about the damage, what he would have paid had he known the truth. That goes to damages. As to fees, the only basis Judge Beery had to award the fees from the trial that involved only a claim of fraud was the seller's note. Fazio kills that. We've talked about that. So what they're arguing now, which is not part of the basis, is that Varner v. Cardenas should be extended because they somehow had to defeat our fraudulent inducement claim to hold on to what they had already won, their breach of contract. Nothing has ever extended that under Texas jurisprudence. Varner v. Cardenas included one trial, and they were kind of cross-claims. In this case, all we dealt with was a fraudulent inducement claim, not asking for rescission. They have their award on the contract claim. It's not related. But let's see what they're really asking you. They're asking this court to tell all Texas courts that in any fraudulent inducement claim you can get your attorney's fees because every fraudulent inducement claim, as an element, necessarily involves a contract. And so they'd be asking you to basically create new law that says what the Supreme Court has not said and said for a fraudulent inducement claim you get your fees. That's not the law. In fact, the Tony Gullo case involved a fraudulent inducement claim that said you've got to go back and segregate. So not only wasn't it a basis for Judge Berry's ruling, it also doesn't apply to this. And finally we get to the real issue. This case was about materiality. And everything that you just heard as an argument and in the brief is an argument that this court gets to consider de novo because Judge Berry made this decision that's a mixed question of law and fact that's reviewed de novo. Mr. Buckley admits and QBE testified they did not rank vendors by state. They didn't. So when he just made up this number one statement, whatever you believe that was, what is undisputed is that he was in possession of the actual ranking showing ranks 8 and 9. We're asking you to reverse and render on liability to reverse and have a redetermination of damages based on the evidence before the court. We're asking you to reverse for a new determination of attorney's fees on the severance issue, which I've just candidly admitted there was an issue. And we're asking you to reverse and render on the attorney fee issue concerning the award and fraud. And my time has concluded. Thank you, counsel. We have your arguments. That will conclude the arguments in front of this panel today. Court will reconvene at 9 in the morning.